IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2019

## JOSHUA P. HOLT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Wilson County**
**No. 15-CR-550        Brody N. Kane, Judge**

_____

**No. M2018-01299-CCA-R3-PC**

_____

The pro se Petitioner, Joshua P. Holt, appeals the dismissal of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of counsel and that his guilty pleas were knowing and voluntary. Following our review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Joshua Paul Hilton Holt, Henning, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Linda Walls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On July 14, 2015, the Wilson County Grand Jury returned a seven-count indictment charging the Petitioner with, among other things, attempted carjacking, two counts of aggravated assault, possession of a firearm by a convicted felon, and evading arrest. The charges stemmed from the Petitioner's May 19, 2015 actions in displaying a

gun while attempting to enter a car in which two passengers were sitting and fleeing from the police officer who responded to the scene.

On May 26, 2016, the Petitioner pled guilty in the Wilson County Criminal Court to aggravated assault and possession of a weapon by a convicted felon in exchange for an effective sentence of twelve years at thirty-five percent to be served consecutively to his sentence for a Michigan conviction for which he was on parole at the time of the instant offenses. In accordance with the plea agreement, the other counts of the indictment were nolle prosquied. The prosecutor recited the following factual basis for the pleas:

> Back on May 19th of 2015 a young lady by the name of Taylor Skeens was sitting in a vehicle belonging to her mother with her little brother, Christian Sanders, in the parking lot located at Adams Lane in Mt. Juliet, Tennessee.
>
> While she was waiting for her mom who had gone into Tropicana Tanning a white male dressed in a green striped shirt approached the passenger's side of the vehicle she was sitting in. It startled her so she initiated the locks on the vehicle.
>
> The gentleman began to pull on the handles of the driver's side doors in an attempt, in her belief, to get into the car with her. She could see a gun which had a silver slide on it with a black handle. Most of the gun was black but it had a silver slide on it.
>
> She could see a gun in his hand. Although he never pointed the gun at her, it did place her in fear for her safety as well as the safety of her brother that was sitting in the car with her.
>
> At that point, she notified her mother and her mother came out after the gentleman left her in the car. He motioned before he left indicating that he was going to use the phone and put the gun back in the front of his pants pocket - - in the middle of his pants pocket.
>
> He left that location as her mother was exiting the building where she had gone in for tanning after being notified by her daughter of the incident and they both notified the police. Officer Jake Short with the Mt. Juliet Police Department responded to take the report.
>
> There was a broadcast with a general description of the individual, a tall white man with a scruffy appearance, appeared to have growth on his

face, a beard forming. He was dressed in a green and possibly white striped shirt and blue jeans.

Both Taylor Skeens and her mother gave similar descriptions. Officer Portal who was coming onto shift at that time was advised of the description. He had gone to Belk for another call, however, he became involved in searching for the subject.

When he was coming around to the area, Pleasant Grove Road in Mt. Juliet, he came around there and talked to an individual who was involved in construction and that individual indicated that a person matching that description had gone into Walmart.

Therefore, Officer Portal went into Walmart to talk to Loss Prevention. As he entered the doors which are located in the middle of Walmart, not the grocery side but the other side, he saw a person sitting on the bench with a red shirt, drinking a drink in a cup, and underneath he noticed that a green and white striped shirt was underneath the person's leg.

As he went in the doors he then came back out, the officer did. At that time he indicated that he needed to talk to that white male who ended up being identified as [the Petitioner].

When he indicated he wanted to talk to him, [the Petitioner] jumped up and proceeded to try to run out the door. At that time, Officer Portal initiated his taser. Before he did that though, he said taser, taser, taser, then fired the taser which stopped the progression of [the Petitioner] who then fell outside of the Walmart.

Subsequently, Officer Short with the Mt. Juliet Police Department, brought Ms. Skeens and her mother, Nona Sanders, to the Walmart location. Initially, they parked down at one end of the parking lot and Officer Short placed Ms. Skeens in the back of his patrol car, drove her up to where the [Petitioner] was seated now in a red shirt and blue jeans.

At that point, she indicated that she was about ninety-three percent sure that this was the man who tried to get into the car with her and had scared her with a gun. When they showed her the green and white striped shirt that had been under the [Petitioner's] leg she indicated that she was ninety-seven percent sure that this was the man that had tried to get into the car with her and had the gun.

Ms. Sanders subsequently came up in the car separate from her daughter. There was no exchange or no communication between the two and she too identified him as the man - - this man had passed her on the way - - her way back out to the car.

On [the Petitioner's] person there was located a firearm, which is still in the custody and control of the Mt. Juliet Police Department, which is a black handled gun with a silver slide on it, which would of course load the next round. The gun, however, was not loaded at that time but the Skeens had no way of knowing that the gun was not loaded, neither did the police officers.

Also located on the person, [the Petitioner], there was a green leafy substance that was later sent to the TBI Crime Lab that was confirmed to be marijuana. [The Petitioner] has a previous history as indicated by his certified convictions out of Michigan of felonies involving violence or threat of violence, which includes the home invasion and a robbery, and he also had a breaking and entering which is not exactly, a quote, unquote, felony of violence, and he did have three felony firearm charges also of the state of Michigan at the time and was in fact on parole out of Michigan when this event occurred.

In April 2017, the Petitioner, acting pro se, filed a motion to withdraw his guilty pleas. In April and May 2017, he filed a pro se petition for writ of habeas corpus in which his argument section consisted of the single word, as well as a number of other pro se motions, including motions/petitions for post-conviction relief.[1]

On May 11, 2017, the court entered an order summarily dismissing the petition for writ of habeas corpus on the basis that it failed to present a colorable claim for relief. The court found, however, that the Petitioner's allegations in his various pro se filings were sufficient to make out a colorable claim for post-conviction relief and appointed post-conviction counsel.

---

[1] The Petitioner filed numerous pro se petitions and motions in this case, including a request for the court to "put on the record" that the Petitioner "had a device implanted in [his] ear normally used by the military to torture terrorists and to read the thought processes and memories of individuals who had the device implanted in their ears" and which had been used to torture him and coerce his confession.

- 4 -

On July 10, 2017, the petitioner, through post-conviction counsel, filed an amended petition for post-conviction relief in which he raised claims of ineffective assistance of counsel and involuntary and unknowing guilty pleas. Specifically, he alleged that his trial counsel was ineffective for providing erroneous information about the range of punishment the Petitioner faced if convicted of the offenses at trial, for not adequately investigating the Petitioner's mental health, and for failing to object to inadmissible hearsay by an officer during the hearing on the Petitioner's motion to suppress, all of which contributed to the Petitioner's entry of unknowing, unintelligent, and involuntary guilty pleas.

The Petitioner's relationship with his post-conviction counsel deteriorated, and on September 11, 2017, the court entered an order allowing post-conviction counsel to withdraw from representation and the Petitioner to proceed pro se. This made for a more difficult evidentiary hearing, with the Petitioner filing a stack of pro se motions and subpoenaing various law enforcement officers he claimed had lied in the information they provided about his case. After ascertaining that none of these proposed witnesses were relevant to the issues raised in the post-conviction petition, the court released them, leaving only trial counsel and the Petitioner as witnesses at the evidentiary hearing.

The Petitioner first called trial counsel as a witness. Interspersed in his questions of counsel were the Petitioner's speeches about officers' having tortured and attempted to kill him and his having been acquainted with the founding member of an Islamic terrorist group, drug dealers from Mexico, and a "hit man." Trial counsel testified that the Petitioner asked her to speak with DEA agents about the possibility of the Petitioner's working as an informant in the middle district of Tennessee in the hopes that it would help the Petitioner's state case. She stated that she spoke with the agents, but they were uninterested in meeting with the Petitioner. She repeatedly explained to the Petitioner that she could not force them to meet with him. She acknowledged the Petitioner was not present at the hearing on the motion to suppress the witnesses' identifications but explained it was a strategic choice that she discussed beforehand with the Petitioner. She further acknowledged that the plea agreement form contained erroneous information about the ranges of punishment the Petitioner faced for counts 6 and 7, which charged the Petitioner with evading arrest and possession of marijuana, and which were erroneously listed on the form as felonies with ranges of punishment of, respectively, two to twelve years and one to six years.

Trial counsel testified that she and the Petitioner had extensive conversations about the possibility of filing an interlocutory appeal on the issue of whether the officer's use of the taser constituted a Terry stop or an actual arrest. According to trial counsel, she strongly advised the Petitioner against accepting the plea offer, but he was adamant that he did not want to go to trial and "absolutely wanted to take a plea agreement." Trial

- 5 -

counsel denied that she ever told the Petitioner that she was unable to take the case to trial. She explained that what she said was that she could not take the case to trial for the amount of money that the Petitioner had paid. She testified that she reviewed her retainer agreement with the Petitioner during their first meeting that and he paid her an initial amount. After they had gone through "ten to twelve pretrial motions" and the Petitioner was struggling to pay her fee, she told him that if he genuinely could not pay the full retainer it would be in his best interest to inform the judge so that an attorney could be appointed for him. She stated that she explained to the Petitioner that he was unable to afford both an attorney and investigators/expert witnesses with the amount he had paid and that the State would provide funding for those expenses if he were appointed counsel. The Petitioner subsequently came up with more money, and trial counsel ultimately cut her fee by $8,000 because the case did not go all the way to trial.

Trial counsel denied that she had a device implanted in her ear that allowed her to speak telepathically and said she had no knowledge of any such device other than through the Petitioner's claims.

On cross-examination, trial counsel testified that she thoroughly discussed with the Petitioner the facts of the case, the strengths and weaknesses of each charge he faced, and their strategy to defend against the charges. In addition, she filed extensive motions, including a motion to suppress the witnesses' identifications of the Petitioner. She also thoroughly discussed with the Petitioner her strategy in not having him present at the hearing on that motion. Trial counsel was confident that the Petitioner understood her reasoning. She said the Petitioner was "a lot smarter" than most of her other clients and had in-depth discussions with her about legal issues that most of her clients did not understand and did not care to discuss. The State provided them with certified copies of the Petitioner's prior Michigan convictions as well as information about the Petitioner's prior Texas convictions. The Petitioner understood that he qualified as a Range III offender based on his record and that he was receiving sentences at the lower end of Range II under the plea agreement. Trial counsel testified that she was most concerned about the Petitioner's felony charges because in her experience misdemeanor charges were regularly dismissed. Finally, she testified that it was the Petitioner's ultimate decision to plead guilty and that she believed he understood exactly what he was doing.

On redirect examination, trial counsel testified that she advised the Petitioner on at least three different occasions prior to the entry of his pleas of the plea agreement and the time he was facing for the charges. She, therefore, believed that the Petitioner fully understood the correct ranges of punishment he faced if convicted of the offenses at trial and that the error with respect to the ranges of punishment for the misdemeanor offenses did not affect his decision to plead guilty.

The Petitioner testified in narrative form that he had information when he was in Michigan about a man who manufactured methamphetamine. He said he reported the information to the "Flint Area Narcotics Group," which passed him from person to person until an officer finally told him that he was going to use the Petitioner in an illegal capacity as an informant. The Petitioner said he did not want to move to Tennessee but his parole officer told him he had to do it. Once in Tennessee, he was "involved with law enforcement and [he] believed they wanted to kill [him]." According to the Petitioner, law enforcement officers in Tennessee were aware that he had armed himself with a gun for self-defense, but they refused to arrest him. He believed that they instead were waiting to try to catch him in a violent crime or to kill him.

The Petitioner testified that he informed trial counsel that he had been armed with a gun for days prior to his arrest and that he wanted to present a defense of duress. He also gave counsel a list of potential witnesses who had knowledge of his prior gun possession and of his having approached 18 or 19 different individuals with requests to borrow their cell phones to call William Shelton, a law enforcement officer who had been sending him money through MoneyGram and Western Union. Trial counsel, however, "just kind of brushed it off."

The Petitioner also complained about trial counsel's failure to act with respect to allegedly false testimony by law enforcement officers. As an example, he claimed that the videotape of his arrest at Walmart would show that the green and white striped shirt that the officer testified was underneath his leg was actually a foot from him on the bench.

On cross-examination, the Petitioner testified that he felt coerced into pleading guilty because: (1) he did not believe trial counsel was pursuing the best path for his defense; (2) he did not want "to sit in the county waiting for an interlocutory appeal to go through" that he did not believe was in his best interest; and (3) trial counsel told him she was unable to take the case to trial for the amount of money he had paid her and he did not have confidence that another attorney would be as "good" as trial counsel.

The Petitioner acknowledged that he received a twelve-year sentence by pleading guilty when he faced a potential fifty-seven-year sentence if convicted of all the offenses at trial. He further acknowledged that he and trial counsel discussed the possibility of his pleading guilty while reserving a certified question of law regarding the legality of his arrest. He said he did not learn until just before the entry of his guilty pleas that he could not reserve a certified question of law because the trial judge, the prosecutor, and his trial counsel were not all in agreement that the issue was dispositive. He reiterated his earlier complaints that he did not waive his appearance at the suppression hearing and that trial counsel did not pursue the course of investigation he wanted regarding the potential

witnesses and the perjured testimony of police officers. The Petitioner suggested that trial counsel's interest in filing an interlocutory appeal was motivated by her desire to take a novel issue to the supreme court, rather than her belief that it would help his case. He said trial counsel told him that she thought his being tasered constituted an arrest without probable cause and at one point even told him that she would work on his case for free if she could take the issue all the way to the state supreme court.

After listening to some of his recorded jail telephone conversations, the Petitioner acknowledged having told his mother that there was "no way" he could beat the convicted felon in possession of a firearm charge, which carried a sentence of fifteen years. He also conceded that in another recorded conversation there was mention of his facing a potential sixty-year sentence, rather than the eighty years he claimed to have believed he was facing. Finally, he acknowledged that he hired trial counsel after the entry of his pleas to represent him at a parole hearing.

On redirect examination, the Petitioner testified that his testimony at the evidentiary hearing was being coerced by the remote neuro monitoring device that had been implanted in his ear, which was directly connected to President Donald J. Trump. The post-conviction court noted for the record that the Petitioner was unable to keep a straight face, grinning and laughing, each time during the hearing that he made mention of the remote neuro monitoring device.

On May 15, 2018, the post-conviction court entered an order dismissing the petition. Among other things, the court found that the Petitioner failed to show that he suffered from any confusion with respect to his potential exposure had he been convicted of the offenses at trial or that his guilty pleas were in any way affected by the erroneous information on the plea form with respect to the misdemeanor charges. The court further found that the Petitioner offered no proof that he suffered from any mental illness and that it "was apparent to the Court that [the] Petitioner's statements and absurd allegations were for entertainment purposes." The post-conviction court accredited the testimony of trial counsel over that of the Petitioner, specifically finding that at any point at which their accounts diverged, trial counsel was "being truthful and [the] Petitioner was either being dishonest or was simply mistaken." Based on its observations of the Petitioner, the court further found that "[t]here could not be a more clear example of one person testifying truthfully, and one person merely making up claims in an attempt to renege on a decision to plead guilty which he now regrets."

In sum, the court concluded that the Petitioner failed to meet his burden of demonstrating that counsel was deficient in her representation or that his guilty pleas were unknowing and involuntary. Thereafter, the Petitioner filed an untimely notice of

appeal to this court. We waived the timely notice of appeal requirement, and the case is now before us on appeal.

## ANALYSIS

The Petitioner argues on appeal that his guilty pleas are unknowing, involuntary, and illegal because the plea agreement form contains several errors, including the erroneous information about the maximum and minimum sentences for his misdemeanor charges and the fact that his full name with both middle names is not listed on the form.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. §40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. Boykin, 395 U.S. at 242. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

In denying the petition, the post-conviction court specifically accredited the testimony of trial counsel over that of the Petitioner. According to trial counsel, she fully discussed with the Petitioner the charges against him, his potential exposure if convicted of the offenses at trial, her defense strategy, the strengths and weaknesses of his case, his criminal record that qualified him a Range III offender, and the plea agreement whereby he was able to receive sentences at the lower end of Range II. She said the Petitioner was much more intelligent than most of her clients and was able to understand and discuss sophisticated legal issues. The Petitioner's extensive prior criminal record certainly gave him a great deal of experience and exposure to the criminal justice system and the plea bargain process. Although the Petitioner claimed at the evidentiary hearing that he was under the impression he faced a potential total sentence of eighty years based on the erroneous information in the plea agreement form, his recorded telephone conversations from the jail show that was not the case. Trial counsel, who testified that she fully discussed the plea agreement and the potential sentences with the Petitioner at least three times prior to the entry of his guilty pleas, expressed her strong opinion that the Petitioner was in no way influenced to plead guilty by the erroneous range of sentence information about the misdemeanor offenses.

Moreover, the transcript of the guilty plea hearing reveals that the Petitioner assured the court that trial counsel had thoroughly discussed the plea agreement with him, that he understood the pleas and the ramifications of pleading guilty, and that he was satisfied with counsel's representation. The Petitioner informed the trial court that he was on medication for post-traumatic stress disorder to prevent him from having nightmares and anxiety but that the medication did not affect his ability to understand the proceedings and that he was entering his pleas knowingly and voluntarily without any coercion or threats from anyone. Accordingly, we conclude that the record supports the trial court's findings and conclusions that the Petitioner received the effective assistance of counsel and entered his pleas knowingly, intelligently and voluntarily.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE